**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                        :
SCHELDON SMITH,                         :     CIVIL ACTION
                                        :
            Plaintiff                   :
                                        :
        vs.                             :     NO. 07-3781
                                        :
CITY OF EASTON,                         :
                                        :
            Defendant                   :
_____:

HENRY S. PERKIN,                                    JULY 7, 2008
UNITED STATES MAGISTRATE JUDGE

<u>**MEMORANDUM**</u>

Plaintiff, Scheldon Smith ("Plaintiff"), claims that he was not promoted to Chief of the Easton Police Department ("EPD") on the basis of race discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (2000).  Plaintiff also alleges a violation of his right to equal protection pursuant to 42 U.S.C. section 1983.  Presently before the Court is the Motion for Summary Judgment filed by the Defendant, City of Easton ("Defendant")(Dkt. No. 30), and Plaintiff's Response to the Motion (Dkt. No. 33).  For the reasons that follow, Defendant's Motion will be granted.

**I.      <u>BACKGROUND</u>.**

Plaintiff is an African American male who was hired by the EPD as a police officer in February of 1995.  On March 30, 2006, Plaintiff formally requested an early retirement.  Smith Dep., Ex. 9.  Four ranking positions within the police department

are, in ascending order, Patrolman, Sergeant, Captain, and Chief.

On January 13, 2004, Plaintiff was promoted to Captain, the second highest rank in the Easton Police Department, by newly elected Mayor Philip Mitman ("Mayor Mitman") on the advice of Chief Stephen Mazzeo ("Chief Mazzeo") even though Plaintiff had previously failed the Sergeant's exam and had not achieved the rank of Sergeant within the police department.[1]  When Chief Mazzeo, the first Chief of Police under Mayor Mitman, resigned his position in September, 2005, Plaintiff was named "Captain in Charge."[2]  This position was the highest rank in the police department and was responsible for overseeing the entire police department.

Beginning on September 25, 2005, shortly after Chief Mazzeo's resignation, and while Plaintiff was Captain in Charge, Defendant advertised for the Chief's position with advertisements in the Pennsylvania League of Cities, the Pennsylvania Chiefs of Police Association, the International Chiefs of Police Association, and The Morning Call newspaper.  Mot., Ex. C, pp. 2-3.  The advertisement was also posted on the Defendant's internet website and the websites of the Pennsylvania Chiefs of Police Association, and the International Chiefs of Police Association.

---

[1]The Chief of Police can choose his own Captains with the approval of the mayor.  Smith Dep., p. 92.

[2]Plaintiff refers to this position as Acting Chief.

Id. at 3.  In the advertisement, the listed qualifications included:

> Applicants should have 10 years experience working in multiple police supervisor positions, experience working in an accredited department, possess or have interstate reciprocity for Act 120 certification, have a high level of police education, preferably a masters degree, and advanced training at the FBI Academy, Southern Police Institute, or Northwestern University School of Police and Staff Command or similar advanced police training facilities.

Smith Dep., Exs. 5, 6.  Defendant hired the Police Chiefs Consulting Service of Pennsylvania to assist in the hiring process.  The Police Chiefs Consulting Service of Pennsylvania provided three consultants to work with the Defendant in the hiring process.[3]  In addition, Mayor Mitman asked two former

---

[3]The parties have alluded to historic issues within the EPD, but have provided little information to this Court outlining those issues. Defendant contends that "early in Mayor Mitman's term, he ordered a complete analysis and evaluation of the police department.  This analysis was performed by the Pennsylvania Chiefs of Police Association and Keystone Municipal Services.  The reports of those organizations were received by the City in June 2005 and were highly critical of the structure and command of the police department.  Mot., p. 2.  To that end, Hogan v. Easton Police Department, No. 04-759, 2006 WL 3702637 (E.D. Pa. Dec. 12, 2006) outlines the findings of a statewide investigating grand jury following the death of an EPD officer, as follows:

> Statewide Investigating Grand Jury # 22, empaneled to investigate the death of EPD Officer and SWAT Team member Jesse Sollman inside a gun cleaning room at the EPD headquarters, issued a report on March 15, 2006, addressing not only the officer's death, but also the command, culture, and training of the EPD.  The Report found, inter alia:
>
> • little effort to establish or enforce safety standards or standards of conduct for EPD officers;

Easton Chiefs of Police and the former chair of the Easton Police Civil Service Commission to form a screening committee to review the initial applications and resumes received by the City.

Forty-eight resumes were received from potential

---

• since 2002 the City paid in excess of $4.4 million in civil settlements on account of police misconduct;

• an individual named John Cuvo was targeted by a written directive of Capt. John Mazzeo, despite the fact that he had not committed a crime, leading to his being stopped, arrested  and beaten, resulting in a $2.5 million settlement, with no disciplinary action taken against any officer involved in the incident;

• SWAT members viewed their membership as elite, distrusted any member of the command structure that had not been a SWAT member, had an improper unit culture that included tattooing of the unit's wolf head symbol, use of the German words Eine fur Alles ("one for all"), wearing unit symbols on uniforms, even though prohibited from doing so by Chief Stephen Mazzeo;

• SWAT members and non-SWAT members had animosity toward Chief Stephen Mazzeo and his attempts to reform the EPD, seeing them as a threat to their independence and the status quo;

• the Grand Jury discerned little recognition by officers of their duties as public servants and episodes of police misconduct appeared to have caused no recognition by them of a need for reform;

• the absence of an enforced code of conduct, written safety rules, and recognized manual of policies;

• the command structure failed to identify and remedy obvious safety deficiencies and establish and enforce a code of conduct.

**The Grand Jury recommended that a code of conduct be established, that the City hire an independent Chief of Police without prior affiliation to the EPD to shake up the command of the force, and that the City establish an internal affairs unit under the Chief's direct supervision.**

Hogan v. City of Easton, 2006 WL 3702637, at *5-6 (emphasis added).

4

candidates.  The initial screening committee reviewed each candidate and ranked the resumes as best, qualified, or weak, based upon the qualifications in the published advertisement for the position.  The top seven applicants were determined by the screening committee and were asked to submit to an initial interview.  The panel and each candidate was supplied with a number of newspaper articles that outlined the problems within the EPD.  Prior to the start of the interviews, one candidate withdrew from consideration and another was determined not to be a viable candidate following a preliminary telephone interview because of his active military status.  The initial interviews were conducted by the three consultants and were observed by Mayor Mitman and his Chief of Staff.  The consultants then recommended three final candidates, Joseph Blackburn, Richard Garapoli, and Alexander Bebris, to be interviewed by the Mayor, his Chief of Staff and a citizens advisory group.

Plaintiff applied for this position both times it was advertised.  Smith Dep., pp. 64-65.  Plaintiff submitted his second application on February 7, 2006.  Smith Dep., Ex. 4.  His resume was not forwarded by the screening committee for consideration of an interview either time he submitted an application.

Following the first round of applications, the interview panel determined that Joseph Blackburn ("Blackburn"),

the former Chief of Police of Allentown, Pennsylvania, should be offered the position.  Mayor Mitman, therefore, nominated Blackburn, but Easton City Council rejected his nomination in December, 2005, based on compensation issues.[4]

As a result of City Council's rejection of Blackburn, on January 11, 2006, City Council passed, and Mayor Mitman signed, Ordinance No. 4765, allowing the City to advertise for a Police Commissioner.  On January 15, 2006, Defendant advertised for the Commissioner position and received new resumes and letters of interest, including Plaintiff's resume.  The two primary candidates for the Chief's position were not considered

---

[4]At all relevant times, the Defendant was a city of the third class that adopted the "Optional Third Class City Charter Law."  As such, the law states as follows:

b.  The city may have a department of administration and shall have such other departments, not exceeding a total of nine, as council may establish by ordinance.  All the administrative functions, powers and duties of the city, other than those vested in the office of the city clerk, city treasurer and city controller, shall be allocated and assigned among and within such departments.

c.  Each department shall be headed by a director who shall be appointed by the mayor with the advice and consent of the council.  Each department head shall serve during the term of office of the mayor appointing him, and until the employment and qualification of his successor.  No member of city council shall head a department.

d.  The mayor, may, in his discretion, remove any department head after notice and an opportunity to be heard.  Prior to removing a department head, the mayor shall first file a written notice of his intention with the council, and such removal shall become effective on the twentieth day after the filing of such notice.

52 P.S. § 41415(d).

because Mr. Garapoli was offered more money at his old job, and Mr. Bebris was not recommended for the position.  The responses to the Commissioner advertisement were considered "underwhelming" both in the number and quality of the candidates.

On March 30, 2006, while Defendant was still evaluating candidates for the position, Plaintiff retired.  Plaintiff had been the Chief in Charge for almost eight months with no complaints or removal from duty.  Smith Dep., p. 84.  Plaintiff's resignation letter, addressed to Mayor Mitman, contained the following language:

> After much consideration, I regret to inform you that I am submitting this letter to formally request an early retirement.
>
> I will be taking advantage of the 5-year give-back and purchasing 5 years military time to retire from my position here as the Acting Chief with 21.16 years of service, effective April 8, 2006.
>
> While I regret the short notice it can not be helped, as I received a call only last week for a new job opportunity.

Smith Dep., Ex. 9.  Plaintiff retired because he anticipated that he could be demoted to patrolman, and was "under fear of not retaining my position.  I told Mr. Gallaher[5] that I could not afford to go from patrolman to captain in -- captain of field services to captain in charge, acting chief, back to patrolman." Smith Dep., p. 83.

---

[5]Stuart Gallaher was Mayor Mitman's Chief of Staff at the time that Plaintiff tendered his resignation letter.

Defendant contends that it possessed a back-up plan which Mayor Mitman termed "double boxing," in which Plaintiff could have been hired from within despite his lack of education. This was a scheme which Mayor Mitman testified he had been exposed to in the business world in which Defendant would hire Blackburn as a part-time interim commissioner for twelve months, with the primary job responsibility of training Plaintiff to assume the Police Chief position.  Plaintiff would also need to attend the requisite classes.  Plaintiff, however, never knew about this program, although he was the Captain in Charge. Although Plaintiff never knew about this "double-boxing" scheme, it had the support of at least two members of Easton City Council.  Defendant contends that Plaintiff's retirement ruled out the double boxing alternative.

On April 8 and 9, 2006, the Commissioner candidate interviews were conducted.  Three candidates were recommended to Mayor Mitman: Timothy Benware, Erby Conley, and Louis Jordan. Mr. Benware withdrew his name from consideration and Messrs. Conley and Jordan, both African American, were not offered positions when their professional background checks revealed that they were unacceptable candidates.  Mayor Mitman did not want to undergo a third round of solicitations because Defendant claims that Mayor Mitman feared that it would be embarrassing, therefore

8

he attempted to convince a police captain[6] from the City of Allentown and a police commissioner from the City of Bethlehem to accept the nomination, but both declined his invitation.

Plaintiff and Michael Gibiser, a white male, held the only two Captain positions under Chief Mazzeo.  Following the retirements of Plaintiff and Captain Gibiser, they were replaced by two white males from within the EPD.  These Captains recommended to Mayor Mitman a former EPD Chief, Larry Palmer, for Chief.  Mayor Mitman contacted Mr. Palmer and verbally offered the position to him.  Approximately twenty-four hours after the offer, Mr. Palmer accepted the position, and City Council confirmed his nomination.

## II.  **PROCEDURAL HISTORY**.

On September 12, 2007, Plaintiff filed his Complaint against Defendant following receipt of the EEOC right to sue letter issued on September 6, 2007.  The case was assigned to the docket of the Honorable James Knoll Gardner.  On November 9, 2007, Defendant filed a Motion to Dismiss the Complaint, and on November 30, 2007, Plaintiff filed his two-count Amended Complaint.  Judge Gardner dismissed the Motion to Dismiss as moot on December 12, 2007.  On the same day, Judge Gardner signed the consent and order referring this case to the undersigned to

---

[6] It is unclear what level of education or experience the Captain from the Allentown Police Department possessed.

conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. section 636(c) and Federal Rule of Civil Procedure 73.

Defendant filed a Motion to Dismiss the Amended Complaint on December 14, 2007.  On January 14, 2008, Plaintiff filed the Response to the Motion to Dismiss.  The Motion was granted in part and denied in part on March 31, 2008, and Defendant was ordered to file an Answer to the Amended Complaint on or before April 21, 2008.  On May 30, 2008, Defendant filed the instant Motion for Summary Judgment.  Plaintiff filed his Response to the Motion on June 15, 2008.

## III. **STANDARD OF REVIEW**.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323

10

(1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  <u>Anderson</u>, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  <u>Id.</u> at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial."  Fᴇᴅ. R. Cɪᴠ. P. 56(e).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  <u>Williams v. Borough of W. Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989)(citing <u>Celotex</u>, 477 U.S. at 325).  The non-moving party has the burden of producing evidence to establish <i>prima facie</i> each element of its claim. <u>Celotex</u>, 477 U.S. at 322-323.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper.  <u>Id.</u> at 322; <u>Wisniewski v. Johns-Manville Corp.</u>, 812 F.2d 81, 83 (3d Cir. 1987).  When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case."  <u>Jones v.</u>

Indiana Area Sch. Dist., 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting Celotex, 477 U.S. at 325).

IV.    **DISCUSSION**.

    A.    **Legal Standard for Title VII Claim.**

       Plaintiff bears the ultimate burden of proving intentional discrimination by a preponderance of the evidence. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  Where there is no direct evidence of discrimination, as in this case, Plaintiff may prevail by producing circumstantial evidence of discrimination under the framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Thus, Plaintiff must first establish a *prima facie* case of unlawful discrimination by presenting facts which, if unrebutted, would support an inference of discrimination.  If Plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision.  Burdine, 450 U.S. at 254; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

       This is a "relatively light" burden for defendants and if met, the burden shifts back to the plaintiff who must demonstrate that the defendant's reason is merely pretext.  Id. Once the employer articulates a legitimate business reason for the decision, any presumption of discrimination drops from the case and the Plaintiff must satisfy his ultimate burden of

proving discrimination.  <u>Burdine</u>, 450 U.S. at 256.  Even if the employer produces evidence of a legitimate, non-discriminatory reason for the employment decision, Plaintiff can still survive summary judgment if he produces "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action."  <u>Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1066 (3d Cir. 1996).  This is evidence for which a fact finder must either: (1) "disbelieve the employer's articulated legitimate reasons," finding them to be "post hoc fabrications or otherwise not really motivating the employment action;" or (2) "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Fuentes</u>, 32 F.3d at 764.

A plaintiff who seeks to prove pretext through the first method in <u>Fuentes</u> must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot be the employer's real reason."  <u>Keller v. Orix Credit Alliance</u>, 130 F.3d 1101, 1109 (3d Cir. 1997).  The plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable fact finder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons." <u>Fuentes</u>, 32 F.3d at 765 (citations omitted, emphasis in original).

Under the second alternative method of showing that the employer's proffered legitimate, non-discriminatory reason is merely pretext, as outlined in <u>Fuentes</u>, a plaintiff could show that invidious discrimination was more likely than not a motivating or determinative factor in the defendant's adverse employment action. <u>Id.</u> at 764. In other words, Plaintiff:

> must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [race] was a motivating or determinative factor in the employment decision. For example, the plaintiff may show that the employer has previously discriminated against [him or her], that the employer had discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.

<u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 644-45 (3d Cir. 1998).

**B.      Discussion of Plaintiff's Title VII Claim.**

In <u>Bray v. Marriott Hotels</u>, 110 F.3d 986, 990 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit set forth the requirements that Plaintiff must establish for a failure to promote claim, which follows <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Plaintiff must show that: (1) he is a member of a protected class; (2) he applied for and was qualified for the position at issue; (3) he was rejected for

the position; and (4) after Plaintiff's rejection, the position remained open and Defendant continued to seek applications for the position from persons with Plaintiff's qualifications. Plaintiff's burden at the *prima facie* stage is not meant to be onerous.  <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

Defendant first claims that Plaintiff cannot establish a *prima facie* case of discrimination because he was not qualified as EPD Chief or Commissioner.  For purposes of this Motion, Defendant concedes that Plaintiff meets the first, third and fourth prongs of his *prima facie* case.  Defendant argues, however, that Plaintiff cannot meet the second prong of the *prima facie* requirement, that he was qualified for the job.  Defendant points to the published advertisement for the positions which stated:

> The applicant must have ten years of experience working in multiple police supervisory positions, experience working in an accredited department, possess or have interstate reciprocity for Act 120 certification, have a high level of police education, preferably a Master's Degree, and advanced training at the FBI Academy, Southern Police Institute, or Northwestern University School of Police and Staff Command or similar advanced police training facilities.

Mot., Ex. A., Exs. 5, 6.  Although Plaintiff performed the duties of EPD Chief for almost eight months, Plaintiff admitted at deposition that he did not possess the required education listed in the advertisement to qualify for the job.  Nonetheless,

Plaintiff argues that he possessed the requisite experience and leadership skills necessary to perform the duties of Chief. Further, in his cover letter which accompanied his second application, Plaintiff acknowledged that he did not have the requisite education, but sought the same consideration as other candidates who might have the listed educational requirements or departmental experience.  Mot., Ex. A, pp. 66-67; Ex. 4.[7]  Based on this admission of his lack of education, Defendant argues that Plaintiff cannot meet the second prong of his *prima facie* test, that he was qualified for the position.

In response, Plaintiff argues that his interim performance as EPD Captain in Charge for almost eight months demonstrates that he was qualified for the positions.  He also states that nothing in the written EPD Chief or Commissioner job descriptions would disqualify him from holding either position,

---

[7]Plaintiff's cover letter specifically states:

Having read the education requirements listed in the job announcement, I agree that education is valuable; however, education alone does not make a leader.  My background and experience is a testimony not only to my ability and willingness to take charge and lead, but also to my ability to influence people to work together for a common goal and the best interest of the whole, not the individual. Therefore, I would appreciate the same consideration as another applicant who might have the education requirements or the departmental experience that has been listed, as it is unfortunate that in the past, the City Administrations have not allowed this Department to concentrate on Accreditation, nor have any officers been educated for future leadership positions.

Mot., Ex. A, Ex. 4, p. 1.

and that Mayor Mitman positively assessed his performance as Captain and later as Captain in Charge.  In addition, Plaintiff notes Mayor Mitman's deposition testimony that he believed that Plaintiff possessed the leadership qualities to be a chief, but that he merely "needed schooling, he had to pass tests."  Pl.'s Br., p. 12 (citing Mitman Dep., p. 57).  Plaintiff finally argues that both national searches yielded no candidates who possessed the objective educational requirements listed in the job description, including two African American candidates other than Plaintiff, and Mayor Mitman testified to this fact during his deposition.  Pl.'s Br., p. 5.  Because this is a motion for summary judgment and all inferences must be drawn in favor of Plaintiff as the non-movant, the Court finds that there is a triable question as to whether Plaintiff was qualified to be EPD Chief or Commissioner.

The next step of the analysis, therefore, is whether Defendant can proffer a legitimate, non-discriminatory reason for its action, shifting the burden back to Plaintiff.  Defendant proffers the objective educational requirements for the positions which were put in place so Defendant could have a Chief or Commissioner who was well-trained to avoid future lawsuits and minimize liability exposure, able to engage in better management practices, able to budget for a distressed city, and have the personality skills to lead a difficult department.  Mitman Dep.,

p. 89-90.

Plaintiff's entire response to the legitimate, non-discriminatory reason consists of the following argument:

> The record is devoid of any evidence that is critical of Plaintiff's performance in police supervisory positions, whether as Captain, or de facto Chief of Police for eight (8) months.  As Stu Gallaher makes clear, after the failure of two national searches for an outside candidate, reality set in, and something less than a perfect candidate was going to have to be hired.  Plaintiff was the obvious choice.  He had performed exceptionally during his tenure as de facto Chief of Police.  He was scheduled to take leadership training at Northwestern University in the summer of 2006 that the Mayor regarded very highly.  See Mitman Dep. at 79, lines 14-25; Mitman Dep. at 86, line 22-25.
>
> However, the Mayor did not want to hire an African American as Chief of Police.  Because Plaintiff had earlier complained about the Mayor's racial insensitivity, Mitman understood that the spectre of race discrimination could be raised by Plaintiff if he were not selected.  Mitman's solution was to invent a "double boxing" proposal, acknowledging Smith's strengths of character and leadership, while emphasizing his lack of formal police education, which would require him to be mentored.  Since Plaintiff was already scheduled to attend the necessary leadership training at Northwestern, there was only one way to prevent Smith from taking advantage of this path to the Chief's job: do not tell Smith about the double-boxing proposal, so that he cannot accept it.  Mitman's protestations at his deposition, that he was "absolutely" disappointed when Smith retired, because he thought in the future he would make an appropriate Chief (see Mitman Dep. at 93, lines 7-12) are simply not consistent with Mitman's failure to even mention this plan to Smith.
>
> Instead, the Mayor's strategy, communicated through his staff, was to tell Smith that he was not going to be hired as Chief.  Given the previous history of demotions of high-ranking officers, Smith's retirement was a real possibility.  Once Smith did retire, the path was cleared to hiring another officer from inside the department, the white officer whom Mitman desired, specifically Larry Palmer.  To confirm

18

the illusory nature of the "double-boxing" proposal,
even Larry Palmer, who was FBI trained and was a
previous chief, had mentoring consultants:

> Q: And ultimately [retired Bethlehem Police
> Commission Francis Donchez] did come as a
> consultant to help Chief Palmer?
>
> A: Yes, sir.

See Smith Dep. at 86, lines 12-14.  The fact is that
the "double boxing" proposal pertaining to Plaintiff
was never a real possibility; it was cynically created
ammunition to defend against a claim of race
discrimination, because Plaintiff's job performance as
"Captain in Charge" while running the department was
beyond reproach.  These disputed issues of fact
preclude the entry of summary judgment, and must be
resolved by a factfinder.

Pl.'s Br., pp. 13-14.  It appears that, in a convoluted way,

Plaintiff is contending that Defendant's ultimate hiring of an

inside candidate is evidence of pretext.

Plaintiff overlooks the fact that the second national

search ultimately yielded no viable candidates for the position.

Moreover, although Plaintiff perceived that he was told by Chief

Mazzeo that he would not be selected because of his race, only

Plaintiff's testimony supports that statement.  Every other

deposition that was taken, including Mazzeo's deposition, does

not support Plaintiff's claim.  Mazzeo specifically stated in his

deposition the following:

Q: Okay.  So between the time that you tendered your
retirement or asked for retirement and January 24th of '06,
did you ever have any discussion with anyone about Smith's
-- Scheldon Smith's future with the department?

A: No.

Q: Did you ever hear Mitman say that Scheldon would never be the chief because he was black?

A: No.

Q: Did you ever tell anyone that Scheldon Smith said -- or that Mitman said Scheldon Smith wouldn't be the chief because he was black?

A: No.

Q: Did you ever hear anybody say that Scheldon Smith wouldn't be the chief of police because he was black?

A: Not that I'm aware of.

Pl.'s Br., Ex. 5, pp. 27-28.

Plaintiff notes that Mayor Mitman conceded that if Plaintiff passed the Northwestern or FBI course, he would have been a wonderful Chief of Police.  Pl.'s Br. at 11 (citing Mitman Dep. at 84, ll. 1-17; Smith Dep. at 66, ll. 7-16).  However, there has been no evidence presented that Plaintiff actually communicated to Defendant or anyone from the City that he was scheduled to attend the Northwestern course in July of 2006.  Rather, Plaintiff retired and thereby thwarted any potential attempt by Defendant to permit him to obtain the required credential.  Taking the evidence in the light most favorable to Plaintiff as the non-moving party, Plaintiff's claim still fails and Plaintiff cannot make his *prima facie* case for his failure to promote claim.

Plaintiff must also show that a similarly situated individual from a non-protected class was promoted instead of

him.  Martin v. Enterp. Rent-A-Car, No. 00-6029, 2003 WL 187432,
at *6 (E.D. Pa. Jan. 15, 2003)(citing Moss v. Koolvent Alum.
Prods., Inc., 962 F. Supp. 657, 669 (W.D. Pa. 1997)).  Similarly
situated individuals are ones who "must have dealt with the same
supervisor, have been subject to the same standards and have
engaged in the same conduct without such differentiation or
mitigating circumstances that would distinguish their conduct or
the employer's treatment of them for it."  Id. (quoting Morris v.
GE Financial Assurance, No. 00-3849, 2001 WL 1558039, at *6 (E.D.
Pa. Dec. 3, 2001)).  Plaintiff does not show that a similarly
situated individual from a non-protected class was given the
position instead of him.  The individual who filled the position
was not similarly situated to Plaintiff, rather he possessed the
requisite education as listed in the public announcement.

        Plaintiff does not inform this Court of any weaknesses
in Defendant's proffered non-discriminatory reason for not
promoting Plaintiff.  Plaintiff has likewise not presented any
evidence that he informed Mayor Mitman or anyone in the
administration or in the selection process that he was scheduled
to attend the requisite Northwestern class.  Chief Palmer
possessed the requisite educational credentials.  Although
Plaintiff contended at his deposition that Mayor Mitman could
have called Plaintiff after his retirement and offered him the
position following the two failed attempts to hire from outside

the EPD, Mayor Mitman had no knowledge that Plaintiff was
scheduled to attend the requisite classes.  Plaintiff has not
produced "sufficient evidence to raise a genuine issue of fact as
to whether the employer's proffered reasons were not its true
reasons for the challenged employment action." Sheridan, 100
F.3d at 1066.  Plaintiff has also not produced evidence for which
a fact finder must either: (1) "disbelieve the employer's
articulated legitimate reasons," finding them to be "post hoc
fabrications or otherwise not really motivating the employment
action;" or (2) "believe that an invidious discriminatory reason
was more likely than not a motivating or determinative cause of
the employer's action." Fuentes, 32 F.3d at 764.  Accordingly,
Plaintiff's Title VII race discrimination claim must be denied.

C.    **Plaintiff's Section 1983 Claim.**

Plaintiff also asserts a civil rights claim pursuant to
42 U.S.C. section 1983.[8]  In order to maintain a claim pursuant
to section 1983, Plaintiff must establish: (1) a deprivation of a
constitutional right; and (2) the deprivation was committed by a

---

[8]42 U.S.C. § 1983 provides, in pertinent part, that:

Every person who, under color of any statute, ordinance,
regulation, custom or usage of any state . . . subjects or
causes to be subjected, any citizen of the United States or
other person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities secured
by the Constitution under the law, shall be liable to the
party injured in an action at law.

42 U.S.C. § 1983.

person acting under color of state law.  See 42 U.S.C. § 1983.
Plaintiff alleges "purposeful discrimination" of his Fourteenth
Amendment equal protection rights by Mayor Mitman, "the highest
policy-maker for Defendant," when he was not hired because of his
race.[9]

     In Monell v. Dept. of Soc. Services, 436 U.S. 658, 691
(1978), the Supreme Court established that municipal liability
under 42 U.S.C. section 1983 may not be proven under the
respondeat superior doctrine, but must be founded upon evidence
that the government unit itself supported a violation of
constitutional rights.  436 U.S. at 691-95.  Municipal liability
attaches only when "execution of a government's policy or custom,
whether made by its lawmakers or by those whose edicts or acts
may fairly be said to represent official policy, inflicts the
injury."  Id. at 694.  "Policy is made when a 'decisionmaker
possess[ing] final authority to establish municipal policy with
respect to the action' issues an official proclamation, policy,
or edict."  Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d
Cir. 1990)(quoting Pembaur v. City of Cincinnati, 475 U.S. 469,
481 (1986)).  Custom may be proven by showing that a course of
conduct, although not specifically endorsed or authorized by law,
is so well-settled and permanent as virtually to constitute law.

---

     [9]The Equal Protection Clause states, in pertinent part, that "no
state shall deny to any person within its jurisdiction the equal
protection of the laws."  U.S. Const. Am. XIV, § 1.

23

Andrews, 895 F.2d at 1480; see also Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989)("Custom maybe established by proof of knowledge and acquiescence.").

        To support an equal protection claim, Plaintiff must do more than simply allege invidious discrimination based on race. Rather, "[a] plaintiff must at least allege and identify the actual existence of similarly situated persons who have been treated differently and that the government has singled out plaintiff alone for different treatment." Marcavage v. City of Phila., 2006 U.S. Dist. LEXIS 55643, at *18 (E.D. Pa. Aug. 3, 2006)(citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). Plaintiff fails to identify any similarly situated individual whom the Defendant treated differently. More importantly, under Monell and its progeny, a municipality may only be liable under section 1983 if it actually caused the complained-of violation. Therefore, the Defendant may be liable under section 1983 only if it had a policy or well-settled custom which caused a deprivation of constitutional rights. Monell, 436 U.S. at 694. As the Third Circuit has made clear, "absent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed in violation by virtue of a policy, a custom, or a failure to train." Simmons v. City of Phila., 947 F.2d 1042, 1063 (3d Cir. 1991). Thus, a plaintiff claiming a municipal violation of 1983

"must both identify officials with ultimate policymaking authority in the area in question and adduce scienter-like evidence . . . with respect to them." Id. at 1062.  Furthermore, a plaintiff seeking to establish municipal liability must show that the policy was the "moving force" behind the constitutional injury; that is, he must "show a causal link between the execution of the policy and the injury suffered." Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984).

Under this standard, Plaintiff's equal protection claim cannot survive summary judgment.  Plaintiff has submitted no evidence whatsoever other than his deposition testimony to support his allegations.  Plaintiff's response points to the following which he characterizes as "evidence to create a triable issue of fact regarding the issue of purposeful discrimination:"

> Plaintiff heard Mayor Mitman used the word "blacks" as a proxy for "criminals" at least three times and had complained; Chief Stephen Mazzeo told Plaintiff that he would not be selected as Chief because he is black; and the explicit rejection of two of the three finalists in the second national search, who were African Americans.

Pl.'s Br., pp. 17-18.  This "evidence" does not support Plaintiff's contentions.  Plaintiff testified:

> Q: At any point prior to you becoming the captain in charge did you think anyone for the city ever did anything to you because of your race, ever treated you any differently, ever harassed you, ever said any names to you, did anything to you that you could say I was treated differently because of my race, prior to becoming captain in charge?
>
> A: No.

Q: So is it fair to say, then, any complaints that you have with regards to your treatment with the City of Easton is after you became captain in charge?

A: I would say my complaint stems from the fact of the captain in charge itself versus acting chief as it should have been from the day they decided to -- they asked Steve Mazzeo to step down and the changes in the regulations to bring in an outside chief.

Q: Let's go back to the statement from Steve Mazzeo. Do you recall when that was made?

A: Exact date?

Q: Yes.

A: No.

Q: Can you give me a historical event?  Was it the day that Steve Mazzeo was asked to resign?

A: I believe it was the day he was asked to resign when he returned from the mayor's office, yes.  Exact date, I do not know.

Q: And on that date, where was Steve Mazzeo, where were you, when the statement was made?

A: We were in the chief's office.

Q: And what did Steve Mazzeo specifically tell you?

A: Specifically to me he said, you would not be chief because you are black.

Q: Those were his exact words?

A: Those were his exact words.

Q: Was anyone else present in the chief's office when this conversation occurred?

A: Yes, sir.

Q: Who else was present?

A: Myself, Captain Gibiser, at the time I believe it

was Sam Lobb, I think he was a lieutenant at the time, Dave Ryan, Jean Dubbs, Barry Golazeski, I believe, and I cannot remember if Kim Camp (phonetic), the old secretary, I can't remember for sure if she was there.

Q: And Steve Mazzeo's specific comments to you was you would not be chief because you were black?

A: Yes, sir.

Q: Did he ever indicate to you that Mayor Mitman specifically said to him that you would not become chief because you were black?

A: No, I don't believe he ever said -- what I've said is Steve Mazzeo said it to me.

Q: Do you know if Steve Mazzeo was offering his opinion or whether he was telling you something factual based on his knowledge of either the city or the current administration?

A: My opinion is he was telling me something factual. Now, where he got those facts from, I can't answer.

Q: Do you have any knowledge, either firsthand or from any source, that Mayor Mitman ever indicated to Steve Mazzeo that you would not become chief because of your race?

A: Other than Steve Mazzeo's comment, no.

Q: And you said Steve Mazzeo's comment never indicated that the comment was specifically coming from Mayor Mitman?

A: Correct.

Smith Dep., pp. 34-37.  Although Plaintiff alleges that Mazzeo told him he would never be Chief because he was black, Mazzeo himself does not corroborate this testimony.  See pp. 19-20, supra.

Despite Plaintiff's recollection of a meeting in

Mazzeo's office, Barry Golazeski, Samuel Lobb, David Ryan, and

Jean Dubbs either deny being present at any such meeting or do

not remember this meeting.  Golazeski testified:

> Q: Let me ask it this way.  Do you remember ever being
> in a meeting in Chief Mazzeo's office where the topic
> of Chief Mazzeo's resignation came up?
>
> A: No.  There was a meeting, a short meeting, in Chief
> Mazzeo's office regarding which way the department was
> going, and I think there was a later one at the Fairnon
> Center -
>
> . . .
>
> -- February 21st --
>
> MR. EASTERLY:  -- You're referring to a document.
>
> THE WITNESS:   -- of 2005.
> These are -- basically it was just minutes of a
> meeting that was held at the Fairnon Center of
> Lafayette College.  And those were the topics of
> discussion.  I think that was the last meeting I
> attended.
>
> Q: February 21 of 2005?
>
> . . .
>
> Q: Scheldon Smith was not present at this meeting?
>
> A: No, he was not.
>
> Q: Do you remember having any information, whether from
> hearsay sources or direct sources, that Chief Mazzeo
> expressed the opinion that Scheldon Smith would never
> be appointed as chief of the Easton Police because of
> his race?
>
> . . .
>
> THE WITNESS: Not because of his race, no.
>
> Q: Did you hear Steve Mazzeo say something that
> expressed an opinion about why Scheldon Smith wouldn't
> be chief for another reason?

A: I don't think it was his opinion.  I think it was --
this is -- the only thing I think he said was Mitman
made a comment he wouldn't be picking Scheldon.  I
think that's the only thing it was in because I think
they were -- if he was being pushed out, I think they
were committed to looking outside the city.  But I
remember no comment saying he wouldn't be chief because
of his race.

Q: This is Mazzeo said something -- was this Mazzeo
directly that you got this information from?

A: I think he would have been the one to say it, but it
wasn't part of -- I don't think it was part of a
meeting or anything.

Q: Okay.  But Mazzeo expressed the opinion to you that
if he, being Mazzeo, was pushed out Easton would have
to look for somebody outside the department?

. . .

Q: I mean is that right or not?  If I got it right, I
want to know.

A: All I'm saying is the comment I remember was that he
wasn't going -- if Steve got pushed out Scheldon would
not be picked. There was nothing to do with race on it.

. . . .

A: As far as a chief, I don't ever remember there being
an African American in charge.

Q: Chief or even acting chief other than Scheldon?

A: Right.

. . .

Q: . . . You were asked if you know if Scheldon Smith
was qualified.  You stated he didn't pass the
sergeant's exam?

A: I'm not sure if he passed it.  We didn't share our
results.  I know there was a sergeant's exam that he
and I had taken at the same time.

Q: Do you believe he was qualified for the position of

chief?

A: I'm not sure what his qualifications are.  I mean he worked on College Hill.  I either worked on the south side or in the D bureau.  I didn't spend a lot of time riding with him.  We had one man cars.  And, you know, what he did beforehand, I know he was in the military, but what experience is there, what he did, I don't know.

Q: If he hadn't passed the sergeant's exam, if that was a fact, would you believe he was qualified for the position of chief?

A: Well, I would think you would have to pass a sergeant's exam in order to move up.  I would hope that would be the same for most positions, detectives, sergeants, lieutenants, captains and chief.

Q: There was also some discussion and you testified that you were aware that Scheldon wasn't going to be hired as chief, you were made aware of that?

A: I think it was just a comment made by Steve Mazzeo.

Q: And you attribute that to the fact that Easton was looking for an outside candidate, correct?

A: Yes.  I believe everything that was going on and eventually what came out in the papers was they did a search outside.

Q: It had nothing to do with Scheldon Smith's race?

A: No.

Golazeski Dep., pp. 19-20.  Samuel Lobb similarly testified:

Q: You've had all the time you need to review that?  I mean I'm going to direct you to a portion of that.  You don't need to remember it perfectly.
     The second paragraph here, it talks about a meeting that occurred after Mazzeo had resigned with Mayor Mitman.  Do you remember such a meeting ever occurring?

A: I don't recall the meeting.

Q: Okay.  There's some statements here attributed to Steve Mazzeo that Gibiser would never be the police chief because he's not respected.  Do you remember Mazzeo saying that at any time?

A: No.

Q: Okay.  There's another statement here that Scheldon Smith would never be the police chief because he was black according to Steve Mazzeo.  Do you remember hearing Steve Mazzeo say that at any time?

A: No.

Q: Did you hear that from any other source ever before today, someone claiming that Scheldon Smith would never be the police chief because of his race?

A: I did not hear that, no.

Lobb Dep., p. 8.  David Ryan testified:

Q: . . . This document you've just gotten a chance to look at, does that refresh your recollection about hearing such statements?

A: No.

Q: Did you ever hear Stave Mazzeo say at any time Scheldon Smith would not be appointed chief because he was black?

A: No.

                           . . .

Q: Did you ever hear Steve Mazzeo or hear anyone say Gibiser wouldn't be appointed chief because he wasn't respected?

A: I did hear that.

Q: When did you hear that?

A: Hang on a second.  Let me rephrase that.
    What I heard was not that he'd never be appointed to chief.  Just that he would probably never make chief because he's not respected.

Ryan Dep., p. 14.  Although Jean Dubbs testified that she was
present at a meeting in Mazzeo's office, she does not recall
hearing that Plaintiff would never be Chief because of his race.
She specifically testified:

> Q: Okay.  This meeting that Scheldon Smith is talking
> about in -- well, strike that.  Let me ask it a
> different way.
>     That meeting in Mazzeo's office, is that the only
> meeting at Mazzeo's office where the whole bunch of
> people were gathered in, or was there another one?
> [sic] to talk about his resignation.
>
> A: That was the only one I was present at.
>
> Q: Okay.  Do you remember, looking at what Scheldon has
> written here, that Captain -- or Chief Mazzeo said
> something along the lines of that Gibiser would not be
> chief because he's not respected and Scheldon --
>
>                   . . . .
>
> Q: Do you remember Chief Mazzeo saying that Gibiser is
> not going to be chief because he's not respected and
> Scheldon Smith is not going to be chief because he's
> not -- because he's black?
>
> A: No, I don't.
>
> Q: Could you describe for me how -- how much you were
> in that meeting?
>
> A: The whole thing.
>
> Q: Okay.  And you -- could you hear everything that was
> being said?
>
> A: Yes.
>
> Q: If that was said, is that something that you would
> remember?
>
> A: Yeah, I think I would remember something like that.
>
> Q: Do you have any information whatsoever on -- well,

okay.  Strike that.

    Let me go to -- there's something else here that
-- in the third paragraph, where Scheldon is talking
about things that the mayor said during meetings about
"roving gangs of blacks."

A: Um-hum.

Q: Did you ever hear the mayor say anything like that?

A: I never heard the mayor say anything like that.

Dubbs Dep., pp. 15-16.

    Even taking the evidence in the light most favorable to
Plaintiff, Plaintiff's evidence of racial animus by Mayor Mitman
is merely speculative and without support.  He presents no record
support for his contention that Mayor Mitman intentionally did
not promote him because of his race.  Moreover, Plaintiff cannot
support a claim against Defendant for a custom of discrimination
against African Americans.  The fact that Plaintiff and one other
African American male were EPD Captains belies this contention.

    Even assuming that Chief Mazzeo made the statement to
Plaintiff that he would never be EPD Chief because of Plaintiff's
race, Plaintiff cannot show that Chief Mazzeo was engaged in the
hiring process for his successor.  Chief Mazzeo had tendered his
resignation when the alleged comment was made.  Plaintiff
testified that he has no knowledge or information that Chief
Mazzeo's statement in any way reflects the opinions or beliefs of
Mayor Mitman or anyone in the City administration.  Smith Dep.,
pp. 37-38.  At most, Chief Mazzeo's statement was merely an

opinion of a former city employee and cannot support Plaintiff's claim of purposeful discrimination by Defendant.  Absent evidence of purposeful discrimination, Plaintiff cannot support his equal protection claim, and Defendant's motion for summary judgment on Plaintiff's section 1983 claim must be granted.

An Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                   :
SCHELDON SMITH,                    :       CIVIL ACTION
                                   :
                Plaintiff,         :
                                   :
        vs.                        :       NO. 07-3781
                                   :
CITY OF EASTON,                    :
                                   :
                Defendant.         :
_____:

## <u>ORDER</u>

        AND NOW, this 7th  day of July, 2008, upon
consideration of the City of Easton's Motion for Summary Judgment
(Dkt. No. 30), and Plaintiff's Response to the Motion (Dkt. No.
33), it is hereby ORDERED that the Motion is GRANTED and all
remaining Motions are DENIED as moot.

        It is further ORDERED that the Clerk of Court shall
mark this case CLOSED for statistical purposes.


                        BY THE COURT:


                         */s/ Henry S. Perkin*
                        HENRY S. PERKIN,
                        United States Magistrate Judge